This case is ultimately about evidentiary gaps in the record, and those gaps establish both of the errors alleged on appeal. Now, the government ignores those gaps, and on the merits, repeatedly asks this Court to credit relevant conduct inferences that it has rejected in the past. Those strained inferences, in turn, highlight the scope of the evidentiary gaps and thereby establish the District Court's failure to comply with the prior panel's mandate. Now since the District Court's failure on the merits informs the mandate claim, I will Police encountered Mr. Johnson at a trap house in Lubbock, Texas, and found him dealing crack cocaine while executing a search warrant. The government points to Mr. Johnson's presence at the location on that date and his participation in the drug trade, and from there asks this Court to affirm a series of relevant conduct conclusions made by the District Court on remand. There were a lot of other, of course, facts that added to it, as you know, such as the fact that he was receiving mail at that location, undisputed, and that he acknowledged that all of the property there was his. Well, Your Honor, I'll begin with the mail. Okay. The mail may establish a connection between Mr. Johnson, in fact, does establish, I'll concede, a connection between Mr. Johnson and the home. So the evidence in the record does establish there's some connection between Mr. Johnson, the home, and his own personal drug dealing. But the Guidelines Manual tells us we need more than that when we're talking about jointly undertaking criminal activity. We're not just looking at the relationship between Mr. Johnson and the home, we're looking at the relationship between Mr. Johnson and the other drug dealers who may have been using the home in the past. For support, I point the Court to the commentary to Section 1B1.3, in particular, Note 4C6. There, the commentary provides a series of hypotheticals concerning jointly undertaking criminal activity. And one notes that a street-level drug dealer who operates in the same geographic area as other drug dealers, and even shares a source of supply, is not thereby engaged in a jointly undertaking criminal activity so long as those drug dealers operate independently. So the record is completely devoid of facts that would establish whether or not Mr. Johnson was operating in tandem with other drug dealers at the residence, or operating independently. And in fact, on the night of his arrest, we found him acting alone. Now, with regard to his claim of ownership of the property, there's a few issues there. One, again, that claim of ownership would not establish his relationship to the other drug dealers, it would only establish his relationship to the home. Second, that's not the basis upon which the District Court resolved the objection on remand. This report was very specific. It resolved the objection based on Mr. Johnson's indirect responsibility by way of relevant conduct. Now, had the District Court, the government nevertheless asked this court to affirm on both a direct responsibility theory and a constructive possession theory. I think the claim of ownership goes to that constructive possession theory. But the problem is, the government is papering over additional gaps in the record. For one, Your Honor, we know that the home was jointly occupied. In page 177 of the record, there is a reference to a man named Devin Samuel. That's in the warrant affidavit submitted to support the search. There, the officer who wanted to search the home notes that Devin Samuel is in charge of the home and controls it. We also know that the police, when they entered the home, found another individual. That's in page 152 of the record. When they entered the home, there was another person in the living room. So, from those facts, we can infer that the home was jointly occupied. But when we have a jointly occupied location, we need more than Mr. Johnson's presence to establish his ownership, possession of the disputed proceeds. But it gets worse from there because two of the wads of cash were found in locations that were essentially hidden. We have one wad of cash, $1,200, that's found behind damaged drywall in the kitchen. I believe at the sentencing hearing, opposing counsel, Mr. Raincourt, referred to that money as stashed away. And we can infer from Agent Williams' testimony at sentencing that it was stashed away so that if they were robbed, it would not be found. On top of that, Your Honors, the $3,500 found in the southeast bedroom, there's no indication that Mr. Johnson had any connection to that room or would have had any knowledge of or access to that money. So I think the claim of ownership is overblown, and I think it papers over a series of pretty serious evidentiary gaps in the record. But I'd like to get back to the district court's one-page order and begin dissecting the various findings it made. One of your criticisms, as I understand it, is that you think that the district court just cut and pasted from the panel opinion? It did, Your Honor, in fact. I think the only thing it changed was Mr. Johnson per defendant. And this goes to not just the district court's failure to develop the facts, but the paltry sentencing record that it had compiled before. Now, there are two ways that may have been appropriate. One was if it had copied and pasted, and then one way or another referred back to the sentencing record to explain the meaning of the inferences underlying its conclusions. But critically, our court did not specify for the district court to make or iterate detailed findings or anything else, right? I think it did, Your Honor, and I think that's because in the final paragraph of the previous panel's opinion, it ordered the district court to do two things. One, to specify the amount of currency that Mr. Johnson was responsible for, and then two, to make the findings required to support that decision. So I think the word required there is doing a lot of work from my side. It is. Well, it is, Your Honor. But again, we have dozens of cases from this court that recognize the distinction between conclusory factual findings and then factual findings that are supported by evidence in the record. So there's a couple things going on here. One, I think that the order by itself is obviously conclusory. It does not engage the prior record, and the district court refused to further develop that record. Was the district court required to cite specific evidence or cite the portions of the record on which it was relying? Your Honor, I don't think it was necessary. In this case, I think it was required to do so, yes, because without those references, we have no idea what inferences underlie its ultimate conclusion. I think there are other cases, and the government points one out in its brief Hammond, where the only problem leading to reversal is the district court's failure to make those explicit findings, to provide the key words that specify its theory. By findings, you mean citations to specific record... I mean, specific record sites. Well, findings come in all shapes and sizes, Your Honor. So they could have come in citations to the previously compiled record, or the district court could have simply reiterated those portions of the record in its one-page order. It did neither, and as a result, we're left to guess at the inferences underlying its ultimate conclusions. And I think the reasonable foreseeability issue is a good example of that. So the government argues that, based on Mr. Johnson's participation in a jointly undertaken criminal activity, that this court can infer his responsibility for all drugs dealt within that jointly undertaken criminal activity. But we know that can't be right, because in United States v. Valdez, this court reversed a sentencing decision, similar inference, based on additional evidence. Now, in United States v. Valdez, brothers Cesar and Hector Valdez were convicted of a series of drug crimes for their roles in a marijuana distribution scheme. The evidence at trial showed that Cesar and his brother Hector had planned the shipments, they had taken part in some of the shipments, and they had even allowed their co-conspirators to use property they owned to either store or repackage the marijuana. Now, the evidence also showed that within the much broader marijuana scheme, there were two shipments of cocaine. One of those shipments, Hector was directly involved in, Cesar was not. And the other shipment took place before Cesar assumed a leadership role within the larger scheme. So, the district court, nevertheless, held Cesar accountable for the cocaine at sentencing. He objected on relevant conduct grounds and pursued the objection on appeal. This court reversed. It found that in order to hold Mr. Valdez, Cesar Valdez in this case, accountable for that cocaine, the district court would have to infer that he was on the hook for any drugs dealt by the conspiracy based on his mere participation alone. And this court has repeatedly rejected that inference in a series of cases going all the way back to 1991, a case called United States v. Puma. So, here the government essentially asked this court to credit the same inference. It says that Mr. Johnson's, all the drug sales from that home were foreseeable, Mr. Johnson, based on his mere participation in the jointly undertaken criminal activity. But we know from Valdez and that series of cases going back to Puma that that simply is not enough. Now, the government's remaining inference is fair, no better, and now I'd like to focus on the first difference from the order on remand. There, the district court found that Mr. Johnson had agreed to engage in a jointly undertaken criminal activity with a third party. And here, the government points to the fact that officers believed other individuals were dealing from the home and from Mr. Johnson's presence on the night of his arrest, they argue that the district court could reasonably infer Mr. Johnson's agreement to take part in a global jointly undertaken criminal activity. Now, we've already addressed how the guidelines deal with that inference. They say that's not enough. We're not looking just at the relationship with the location. We're looking at the relationship between the various defendants. But I think this court's decision in the United States to be Smith provides some additional support for my opinion. So, in Smith, there's much more evidence than we have here. Two defendants had gone to trial. The evidence established that there were four individuals, Chaney, Adams, Phillips, and Smith. Mr. Phillips had directed an undercover officer to Ms. Smith to buy crack cocaine. The officer approached Ms. Smith, Mr. Chaney, Mr. Adams. They were all dealing from the same porch. And ultimately bought from Ms. Smith, despite the fact that Chaney and Adams also offered to sell. So, when the officer made the move to arrest all four individuals, they ran into the home. The officer follows them into the home, finds additional crack cocaine, and then holds Ms. Smith and Mr. Phillips accountable for that cocaine at sentencing. They object on relevant conduct grounds. They lose at the district court level and pursue the same objection on appeal. Now, if the government were correct about the supposed inference underlying the district court's initial finding on remand, we would expect a very short opinion in Smith affirming both sentences. Because, after all, both Phillips and Smith were present at a trap house and were directly participating in drug dealing. But the court's analysis was much more complex. Now, it affirmed as to Ms. Smith, but not based merely on her presence and participation. It noted that she had a relationship to the home and a pre-existing relationship to Chaney and Adams. In particular, it noted that she knew Chaney and Adams were drug dealers. She knew they used the home to deal drugs. She had a relationship to the home because her mother owned it. And she actually got the crack cocaine and she sold the undercover officer from a source of supply she met through Chaney. So, based on all of that, this court held that the district court could reasonably infer a generally undertaken criminal activity involving Chaney, Smith, and Adams. But it went the other way on Mr. Phillips. On Mr. Phillips, it found that the evidence established only a small, discrete agreement with Ms. Smith, not a broader agreement that would encompass both Chaney and Adams. And that reversal conflicts with the initial inference urged by the government on appeal. If presence and participation were enough, we would expect this court to have affirmed Mr. Phillips' sentence, but it did not. Finally, Your Honors, with my remaining two minutes, I would like to address, go back to Judge Smith's initial question concerning the claim of ownership in the mail. I think those facts are most helpful to establish alternative bases for responsibility, either through direct responsibility under Section 1B1.3 or under constructive possession. But, the government's arguments on this point overlook an obvious flaw. And that's that the record provides no alternative grounds upon which to affirm. So, this court may affirm on any basis in the record, but on limited remand, the district court was very specific. It specified an indirect theory of responsibility, and the government spends much of its brief supporting findings the district court never made. In effect, it's supporting an order the district court never issued. On top of that, Your Honors, I'll note that although the court can affirm on other grounds, that power is ultimately discretionary. And this court has repeatedly declined to exercise that discretion where the alternative ground is fact-intensive or where the record is insufficiently And I think here, both are obviously true. And if there are no other questions, Your Honors, I retain the rest of my time for rebuttal. Thank you. Yes, you've saved time for rebuttal. Thank you, Mr. Brown. Mr. Rancourt? Good morning. My name is Steven Rancourt, and I'm proud to represent the government in this case. May it please the court, the government respectfully asks that this court affirm the judgment of the district court because the lower court complied with the letter and the spirit of the mandate and because it is plausible from the record that the money found in the wall and bedroom of Johnson's house was drug proceeds from jointly undertaken criminal activity. On remand, this court instructed the lower court to make two specific findings. One, make an express finding whether or not Johnson was either directly or indirectly responsible for the drug proceeds found in that house when he was arrested, and it did. It found him indirectly responsible. Following that, this court instructed that if the court chose to find him indirectly responsible, it needed to make three express findings, and the court did so. The court found that Johnson agreed to participate in drug sales with a third party, that the drug sales at issue were within the scope of that joint activity, and that Johnson could have reasonably foreseen the quantity of drugs represented by those sales in connection with the joint undertaking. And those findings are subject to the usual plausibility standard of review? Yes, Your Honor. This court should review whether or not the lower court complied with the mandate under a de novo standard, but it should find so, and then it reviews the record under a clear error standard, and it's clear from the record that the court's findings were plausible in light of the record as a whole. At sentencing, there was a task force officer who was very experienced in crack cocaine sales and narcotics investigations, who testified about not only the money found in Johnson's pocket and on the table, which he does not contest, were drug proceeds, but specifically why the $1,200 found in the kitchen wall, which was the same room that Johnson was found when he was arrested, as well as the $3,504 found in the bedroom, how both of those were also connected to Johnson through drug proceeds. And his testimony was unrebutted. The $1,200 that was found in the wall, task force officer Williams testified that that was money going back into the business, that drug dealers, specifically crack cocaine dealers, would separate their profits to keep the profits separate from the money that they had to return because the narcotics in this case were likely fronted. The $3,504 found in the bedroom was money separated as profit and it's bolstered when you consider that $2,105 was actually found in Johnson's pocket and that's money that he obviously does not contest was drug proceeds. So the officer testified that that money, the $3,504 and then the $2,100 was profits essentially separated out so that if Mr. Johnson or his compatriots were robbed in that house it would not result in a total loss of income essentially. So the reasonable inferences that the court made are plausible in light of the entire record and I'd like to talk about each individual issue if I may. First, whether or not Johnson agreed to participate. Where is it in the record that the court could have made such a finding? Well, there were several controlled purchases made from the house in the months preceding the warrant and that's in the record on page 216 and 217 there was testimony that the house was set up as a trap house and Johnson does not dispute that he was selling narcotics from that house. Were the drug sales made at the house within the scope or in furtherance of that activity? And again, he does not contest the money found in his pocket and $831 on the kitchen table is this other money found in the house attributable to Johnson as part of a joint undertaking. And then lastly, whether or not Johnson could have reasonably foreseen the quantity of drugs represented by those sales in connection with a joint undertaking. So Mr. Brown has discussed this at least in part in terms of that there was in his view no broader agreement. There was a more narrow agreement. Can you address he addressed that specifically in regard to the Smith case I believe. Yes, your honor. In fact, your honor, I believe your affirmance in Berry last year is particularly instructive on this issue. In Berry, as the court may remember that the defendant contested the conversion of roughly $15,000 in drug proceeds. He said that there was an insufficient connection between those drug sales and little direct evidence  The defendant had asserted there that there were alternative sources for the money but he had presented no evidence to support it but most importantly the court affirmed converting those $15,000 in cash when Berry had admitted to receiving the methamphetamine in the month or so before the money was seized. In this case, the scope when we're looking at Judge Smith, you stated that that close of a temporal proximity is a particularly strong indicator of relevance and in that case, we're dealing with narcotics that were found in roughly a month separated from the seizure of the money. Here, the government is only asking this court to uphold the district court sentence where the money at issue and the drug proceeds at issue are found on the same evening of the search warrant. So this is not a case where the government is trying to ask this court to extrapolate the months of the sales preceding the execution of the search warrant and as there were several controlled purchases made from the house in the months preceding the warrant. What the government is asking this court to uphold, what the district court did is just extrapolate the money found at the house during the execution of the warrant on that evening and only that money. We believe that there's testimony in the record that shows how the contested proceeds in this case are attributable to Mr. Johnson under theory of joint liability. So the issue about ownership I think the government is not asking this court to affirm on an alternative basis. I would ask this court to consider that statement as it goes to whether or not the drug proceeds were foreseeable to Johnson when he admitted ownership of property located in the residence. He lived or at least had some degree of control over the residence as well addressed to him during the search warrant. Again, there were two controlled buys in the months preceding the warrant and then traffic stops in October and November of 2018. The warrant was executed in late November of 2018. And then lastly, the issue of foreseeability just goes to a matter of common sense. Johnson pled guilty to possession with intent to distribute cocaine base from that house. The idea that Johnson would fail to reasonably foresee distribution of cocaine base by others from the same location when Johnson was in possession of some of the money that had been separated out from prior drug sales just simply belies common sense. An individual, as this court stated in Thomas, that an individual dealing in sizable amounts of controlled substances ordinarily would be presumed to recognize that the drug organization with which he deals extends beyond his universe of involvement. And again, we're not asking for Johnson to be held accountable for months of cocaine base sales and months preceding the warrant, but rather asking this court to uphold the district court where the money converted is profit seized from the trap house where Johnson gets mail and where he's found sitting on top of cocaine base and in possession of thousands of dollars of cash that he does not contest. Johnson argues that there's no additional evidence proving long-term participation in other sales at the trap house or elsewhere. And that's true, but it overstates the universe of involvement that we're talking about here, and the universe of involvement is small. So for those reasons, Your Honors, the district court complied with the letter in the spirit of this court's mandate. It made the express findings that this court required it to make in order to find Johnson indirectly responsible, and then under a clear error standard of review, this court should have no heartburn to conclude that the court's findings were plausible in light of the record as a whole. Your Honors, the district court faithfully and accurately applied this court's instructions following remand, and the findings are supported by the record. The district court's findings and its reasonable inferences from those findings are plausible in light of the record as a whole, and under a clearly erroneous standard of review, this court should not be left with a definite and firm conviction that a mistake has been committed. We would therefore respectfully request that you affirm the judgment of the district court, and if the court does not have any more questions, I yield the remainder of my time. All right. Thank you, Mr. Bancroft. Mr. Brown, you've saved time for rebuttal. Thank you, Your Honor. Briefly, I'd like to address the authority cited by the government both Thomas and Barry. I'll begin with Thomas. So the rule from Thomas is pretty straightforward. If a defendant is involved in large-scale drug dealing, we can assume the defendant knows there will be other large-scale drug dealing within that same organization. But there's a couple problems here. One, the evidence in Thomas proved an ongoing relationship between Mr. Thomas and the organization. In fact, there were drug ledgers that showed that he had been assigned a code number from the source of supply and that he had engaged in large purchases of cocaine over a substantial period of time. Also, the facts of the deal in which he pleaded guilty are very different from the facts we have here. Mr. Thomas pleaded guilty to a deal involving 45 kilograms of marijuana, but even the government's own witness testified that Mr. Johnson was dealing in street-level quantities of crack cocaine. That's on page 128 of the record. Now, with regard to Barry, Barry is, on the one hand, legally distinguishable. That case dealt with the question of whether or not Mr. Barry was directly responsible under Section 1B 1.3 A1A. But again, the facts underlying the District Court's decision in that case were much broader than the facts we have here. We know that because the Wichita Falls Police Department received an attempt that Mr. Barry himself was dealing. That's distinguishable from this case because here, we know the police were concerned about dealing from the home, but until they arrived to execute the search warrant, Mr. Johnson was not on their radar. On top of that, Your Honors, the Barry case involved a series of controlled buys involving Mr. Barry directly. So from those two facts, the initial tip and the controlled buys that took place after his arrest, this Court could infer his direct responsibility for that money. Also, Mr. Barry was not disputing whether or not he had a connection to the home. It was, in fact, his residence. And on that point, Your Honors, I would like to make one final point concerning the objections that were advanced below. The initial PSR stated that the investigation of the home, which is summarized in a single paragraph, led officers to believe that Mr. Johnson and others were dealing drugs from the home. Now, my colleague in Lubbock objected to that, and she said that the investigative material provided no basis from which to infer that Mr. Johnson had taken part in any of those prior deals. The addendum accepts that objection at page 216, and it changes the sentence just to say that individuals were dealing from the home. And again, I think that's sort of the crux of this case. We just don't have enough specificity in the record to establish Mr. Johnson's relationship to those individuals. I'm not sure that their identities are required, but their identities or the nature of the large organization certainly would be helpful to support the conclusory findings in the District Court's order on remand. That's all I have, Your Honors. Thank you. Thank you, Mr. Brown. Your case is under submission.